**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

ISMAEL SALAM, individually and on behalf
of all others similarly situated,

               Plaintiff,

    v.

LIFEWATCH, INC., a New York corporation,

               Defendant.

Case No.  13-cv-09305

Hon. Charles R. Norgle, Sr.

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF RULE 23 MOTION
TO CERTIFY A CLASS, APPOINT PLAINTIFF AS CLASS REPRESENTATIVE, AND
TO APPOINT KATRINA CARROLL OF LITE DEPALMA GREENBERG, LLC
AND PETER LUBIN OF DITOMMASO LUBIN P.C. AS CO-LEAD COUNSEL**

## TABLE OF CONTENTS

**Page(s)**

Table of Authorities ......................................................................................................... ii

OVERVIEW ...................................................................................................................... 1

FACTS ............................................................................................................................... 2

    1.    Lifewatch was aware of, authorized the use of, and controlled and monitored the robo-calling scheme that violated the TCPA .......................................................... 2

    2.    Lifewatch and its agents made robo-calls to Mr. Salam and other members of the class without their prior express consent ............................................................. 5

    3.    Lifewatch benefitted from the robo-calling campaign ........................................... 6

ARGUMENT ..................................................................................................................... 7

I.    The TCPA ................................................................................................................ 7

II.    The Applicable Legal Standard for Class Certification under Rule 23 ............................ 10

III.    The Proposed Class is Readily Ascertainable .................................................................. 10

IV.    The Class Satisfies Rule 23(a) ....................................................................................... 11

    A.    Numerosity ................................................................................................................ 11

    B.    Commonality ............................................................................................................. 12

    C.    Typicality .................................................................................................................. 14

    D.    Adequacy .................................................................................................................. 15

V.    The Class Satisfies Rule 23(b)(3) ................................................................................. 18

    A.    Predominance ........................................................................................................... 18

    B.    Superiority ................................................................................................................ 20

CONCLUSION ................................................................................................................. 22

# TABLE OF AUTHORITIES

**Cases**                                                                     **Page(s)**

*Adams v. R.R. Donnelley & Sons*,
  2001 U.S. Dist. LEXIS 4247 (N.D. Ill. Apr. 6, 2001) ....................................................13

*Agne v. Papa John's Int'l, Inc.*,
  286 F.R.D. 559 (W.D. Wash. 2012) ............................................................................2, 9

*Alliance to End Repression v. Rochford*,
  565 F.2d 975 (7th Cir. 1977) .......................................................................................10

*Bank v. Lifewatch, Inc.*,
  Case No. 15-cv-2278 (E.D.N.Y.)...................................................................................21

*Birchmeier v. Caribbean Cruise Line, Inc.*,
  302 F.R.D. 240 (N.D. Ill. 2014)......................................................................................9

*Chapman v. Wagener Equities, Inc.*,
  2014 U.S. Dist. LEXIS 16866 (N.D. Ill. Feb. 11, 2014) ..........................................20, 21

*De La Fuente v. Stokely-Van Camp, Inc.*,
  713 F.2d 225 (7th Cir. 1983) .......................................................................................14

*FTC v. Worldwide Info Systems, Inc., et al.*,
  6:14-cv-8-ORL-28DAB ...........................................................................................4-5

*FTC and State of Florida v. Worldwide Info Services, Inc.*,
  No. 6:14-cv-8-0rl-28 (M.D. Fla.)....................................................................................5

*Gen. Tel. Co. of Sw. v. Falcon*,
  457 U.S. 147 (1982).......................................................................................................12

*G.M. Sign, Inc. v. Finish Thompson, Inc.*,
  2009 U.S. Dist. LEXIS 73869 (N.D. Ill. Aug. 20, 2009) .................................................20

*Gomez v. St. Vincent Health, Inc.*,
  649 F.3d 583 (7th Cir. 2011) .......................................................................................15

*Gomez v. Ill. State Bd. of Educ.*,
  117 F.R.D. 394 (N.D. Ill. 1987).....................................................................................15

*Hinman v. M and M Rental Ctr., Inc.*,
  545 F. Supp. 2d 802 (N.D. Ill. 2008) ..................................................................... *passim*

ii

*Ira Holtzman, C.P.A. v. Turza*,
  728 F. 3d 682 (7th Cir. 2013) ........................................................................2

*Keele v. Wexler*,
  149 F.3d 589 (7th Cir. 1998) .......................................................................13

*Kernats v. Comcast Corp.*,
  2010 WL 4193219 (N.D. Ill. October 20, 2010) ............................................19

*Knutson v. Schwan's Home Serv., Inc.*,
  2013 WL 4774763 (S.D. Cal. Sept. 5, 2013) ..................................................11

*Lau v. Arrow Fin. Servs., LLC*,
  245 F.R.D. 620 (N.D. Ill. 2007) ...................................................................11

*Lee v. Stonebridge Life Ins. Col*,
  289 F.R.D. 292 (N.D. Cal. 2013) ....................................................................1

*Life Alert Emergency Response, Inc. v. LifeWatch, Inc.*,
  601 F. App'x. 469 (9th Cir. Jan. 9, 2015) ...................................................4, 5

*Manno v. Healthcare Revenue Recovery Grp., LLC*,
  289 F.R.D. 674 (S.D. Fla. 2013) .....................................................................1

*Maxwell v. Arrow Fin. Servs., LLC*,
  Case No. 03-c-1995, 2004 WL 719278 (N.D. Ill. Mar. 31, 2004)....................15

*McCabe v. Crawford & Co.*,
  21 F.R.D. 631 (N.D. Ill. 2002)......................................................................11

*Meiresonne v. Marriott Corp.*,
  124 F.R.D. 619 (N.D. Ill. 1989).....................................................................13

*Messner v. Northshore Univ. HealthSystem*,
  669 F.3d 802 (7th Cir. 2012) ........................................................................10

*Mullins v. Direct Digital*, LLC,
  795 F.3d 654 (7th Cir. 2015) ................................................................ *passim*

*Pastor v. State Farm Mut. Auto. Ins. Co.*,
  487 F.3d 1042 (7th Cir. 2007) .....................................................................21

*Rosario v. Livaditis*,
  963 F.2d 1013 (7th Cir. 1992) ......................................................................13

iii

*Salam v. Lifewatch, Inc.*,
  Case No. 13-cv-9305 (N.D. Ill.) ................................................................16, 21

*Savanna Grp., Inc. v. Trynex, Inc.*,
  No. 10-CV-7995, 2013 WL 66181 (N.D. Ill. Jan. 4, 2013)....................................9, 18, 20

*Streeter v. Sheriff of Cook County*,
  256 F.R.D. 609 (N.D. Ill. 2009)................................................................................19

*Sullivan v. DB Invs., Inc.*,
  667 F.3d 273 (3d Cir. 2011) ......................................................................................13

*Wal-Mart Stores, Inc. v. Dukes*,
  131 S. Ct. 2541 (2011) ..............................................................................................12

*Whitten v. ARS Nat'l Servs. Inc.*,
  No. 00 C 6080, 2001 WL 1143238 (N.D. Ill. Sept. 27, 2001).........................................13

*Williams-Green v. J. Alexander's Restaurants, Inc.*,
  277 F.R.D. 374 (N.D. Ill. 2011)................................................................................18

*Young v. County of Cook*,
  2007 WL 1238920 (N.D. Ill. Apr. 25, 2007) No. 15-cv-2278 (E.D.N.Y.) ........................19

## **Other Rules & Statutes**

Fed. R. Civ. P. 23(a) ................................................................................ *passim*

Fed. R. Civ. P. 23(a)(1) ...........................................................................................11

Fed. R. Civ. P. 23(a)(4)...........................................................................................15

Fed. R. Civ. P. 23(b)(3)........................................................................... *passim*

47 U.S.C. § 227................................................................................................1, 7

47 U.S.C. § 227(b) ..........................................................................................8, 9

47 U.S.C. § 227(c) .............................................................................................9

47 U.S.C. § 227(b)(1)(A)(iii) ...................................................................................2

47 U.S.C.§ 227(b)(3)(C) .......................................................................................19

9 V.S.A. § 2460 .................................................................................................4

iv

Pursuant to Federal Rule of Civil Procedure 23, Plaintiff Ismael Salam ("Plaintiff"), on behalf of the proposed Class, respectfully moves this Court for an order (i) certifying a class of individuals as defined below, (ii) appointing Plaintiff as the Class Representative, (iii) appointing Katrina Carroll of Lite DePalma Greenberg, LLP and Peter Lubin of DiTommaso Lubin P.C. as Co-Lead Counsel for the Class, and (iv) granting such further relief as this Court deems reasonable and just. In support thereof, Plaintiff states as follows:

## <u>OVERVIEW</u>

This case arises from a massive, unsolicited robo-call campaign designed to sell medical alert systems that provide emergency support upon a senior's incapacitation, sold by Defendant Lifewatch, Inc. ("Lifewatch"). The campaign involved millions of automated telephone calls and artificial or prerecorded messages, all made without the prior express consent of the called party in violation of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227 *et seq*. The telemarketing services which were employed by Lifewatch used automatic telephone dialing systems and/or artificial or prerecorded messages to deliver an offer of medical alert devices (often misrepresented as being "free"), available to the answering party if he or she would hit a button. Upon pressing the requisite button, the answering party would be transferred to a Lifewatch salesperson. Many of the consumers who received these unsolicited calls are elderly, live alone, and have limited or fixed incomes.

The policy behind Rule 23 is to aggregate this type of claim into a class action, and so numerous courts have certified similar TCPA class actions under Rule 23(b)(3). *See, e.g., Manno v. Healthcare Revenue Recovery Grp., LLC*, 289 F.R.D. 674 (S.D. Fla. 2013) (certifying a class of individuals who received illegal automated calls under the TCPA); *Lee v. Stonebridge Life Ins. Col*, 289 F.R.D. 292 (N.D. Cal. 2013) (certifying nationwide class of individuals who

received unsolicited text messages and calls); *Agne v. Papa John's Int'l, Inc.*, 286 F.R.D. 559 (W.D. Wash. 2012) (the same); *see also Ira Holtzman, C.P.A. v. Turza*, 728 F. 3d 682 (7th Cir. 2013) (observing that "[c]lass certification is normal in litigation under §227, because the main questions … are common to all recipients."). Class certification is equally appropriate here.

Plaintiff now asks the Court to certify a class of people who received the illegal calls intended to induce a sale of medical monitoring devices and services on their cellular telephone lines (the "Class"), defined as follows:

> **Proposed Class:** All individuals in the United States who received one or more phone calls directed to a telephone number assigned to a cellular service using an automated telephone dialing system or an artificial or prerecorded message made by, on behalf of, or for the benefit of Lifewatch from October 16, 2013 through the present.

The relevant statute provides:

> It shall be unlawful for any person within the United States ….(A) to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice …(iii) to any telephone number assigned to a…cellular telephone service…."

47 U.S.C. § 227(b)(1)(A)(iii).

## FACTS

As explained below, because Lifewatch (1) was aware of, authorized the use of, and controlled the robo-calling scheme, (2) did not have express written authority to contact the consumer, and (3) benefitted from the illegal calls at issue, each call made by Lifewatch violated the TCPA.

**1.     Lifewatch was aware of, authorized the use of, and controlled and monitored the robo-calling scheme that violated the TCPA.**

According to declarations and statements of telemarketers utilized in Lifewatch's scheme, robo-calls were made to consumers anywhere from 10,000 consumers per day up to two

555094.1

million consumers per day, six days a week.  For example, one telemarketer stated during a conversation with a consumer that the initial outbound call containing the pre-recorded message is generated by "a main PBX server," and the company "cycles" through "around 10,000 [numbers] a day."  Exhibit A: FTC PX 1 (Menjivar Decl.), Att. XX at 20:13-24 (transcript of 11/19/2014 digital recording).[1]  Another telemarketer, which provided its services solely to Lifewatch, "sent out nearly 2 million calls per day, six days per week, to consumers."  Exhibit B: FTC PX 15 (Settecase Decl.) at ¶¶ 4, 7.  That telemarketer, who was responsible for the "dialer" that "sent out" the outbound calls to consumers for Lifewatch using pre-recorded messages, *id.* at ¶¶ 6-7, was able to connect 800,000 to 900,000 of its calls.  *Id.* at ¶ 7.  Of those connections, 10,000 – 20,000 were then connected to a live telemarketer when the consumer pushed a button on his or her phone.  *Id.* at ¶¶ 6, 11.

Lifewatch knew that its telemarketers were using robo-calls to contact consumers.  For example, Joseph Settecase, who owned a telemarketing company that made robo-calls on behalf of Lifewatch, declared that "Lifewatch was aware of all the telemarketing activities [his company] engaged in on Lifewatch's behalf."  Ex. B at ¶ 4.  Similarly, Leslie Steinmetz, who helped Lifewatch develop new business, including through the use of telemarketing, confirmed in a declaration that Lifewatch knowingly used telemarketers, and that robo-calls were being used by telemarketers to sell Lifewatch's medical alert systems.  Exhibit C: FTC PX 76 (Steinmetz Decl.) at ¶ 8.  Mr. Steinmetz further declared that Lifewatch had every intention of continuing to use robo-calling as long as it could in order to obtain new customers.  *Id.*  And why wouldn't it?  The scheme worked:  By using robo-calling to obtain its customers, Lifewatch added approximately 8,000 new customers to its inventory each month.  Exhibit D: FTC PX 13

---

[1] Only the attachments to Exhibit A: FTC PX 1 that are relied upon by Plaintiff herein are submitted as part of the exhibit due to volume.

3

(Gross Decl.) at ¶ 13.

In fact, there is ample evidence that Lifewatch controlled and monitored its telemarketers.[2]  For example, Michael Hilgar, the operations manager of the call center for Worldwide (and a defendant permanently enjoined from telemarketing in the *FTC v. Worldwide* litigation, *infra*), declared that "Lifewatch did control, oversee and supervise Worldwide in its efforts to obtain customer accounts for Lifewatch."  Exhibit E: FTC PX 14 (Hilgar Decl.) at ¶ 12. Similarly, Mr. Steinmetz declared that Lifewatch "did control and monitor the telemarketers that it worked with" and "employees were in regular contact with representatives of its telemarketers." Ex. C at ¶ 4.  *See also* Ex. D at ¶¶ 9-10 (Lifewatch confirmed its responsibility to monitor and control telemarketers, and to ensure that its telemarketers used the scripts Lifewatch provided); Exhibit H: FTC PX 5 ("Bradley Decl.), Att. C (excerpted) at p. 30, ¶ 1(d) (telemarketing services agreement requiring telemarketer to use scripts approved by Lifewatch); Ex. E at ¶ 6 (Lifewatch requested recordings of telemarketing calls for review).

Lifewatch knew that its robo-calling scheme violated the TCPA due to the number of lawsuits filed against it for TCPA (or TCPA-type) violations.  *See, e.g.,* Ex. A, Att. K at ¶ 17 (Lifewatch Inc. Response to Civil Investigative Demand Pursuant to 9 V.S.A. § 2460 from State of Vermont, Office of Attorney General) (identifying cases from November 2012 through January 2014).   At least ten TCPA (or TCPA-type) actions had been commenced against Lifewatch either before, or around the same time as, Mr. Salam received the unwanted robo-call in December 2013.

Moreover, in January 2014, the FTC commenced an action against Worldwide Info

---

[2] In a trademark infringement case against Lifewatch, the Ninth Circuit held that "ample evidence supports the inference that Lifewatch directs, induces, is aware of, and can control the infringing telemarketing." *Life Alert Emergency Response, Inc. v. LifeWatch, Inc.*, 601 F. App'x. 469, at 472 (9th Cir. Jan. 9, 2015). A copy of the opinion is attached hereto as Exhibit L.

4

Systems, Inc. ("Worldwide") and others for deceptive and abusive telemarketing services. *See FTC v. Worldwide Info Systems, Inc., et al.*, 6:14-cv-8-ORL-28DAB. Worldwide solely provided telemarketing services to Lifewatch, Ex. E at ¶ 4, and was a substantial provider thereof, Exhibit F: FTC PX 16 (Kane Decl.) at Ex. A, p. 6 (Jan. 9-30, 2014 Report of Receiver's Activities *FTC and State of Florida v. Worldwide Info Services, Inc.*, No. 6:14-cv-8-0rl-28 (M.D. Fla.) (from March 2012 through May 2013, Lifewatch paid Worldwide Info Services, Inc., $8,269,193.50). Yet, during the course of litigation against Worldwide, and even after Worldwide was permanently enjoined from participating in telemarketing activities in November 2014, wireless consumers were *still* receiving unauthorized robo-calls from Lifewatch on their wireless phones. *See, e.g.,* Exhibit G: FTC PX 50 (Mey Decl.) (calls made to two wireless phone numbers on the Do Not Call Registry in 10/13, 8/14, 9/14 (multiple), 10/14 (multiple), 11/14 (multiple), 12/14, and 1/15 (multiple)).

Based on the foregoing, there is substantial evidence that Lifewatch authorized and encouraged the robo-calling scheme at issue in this litigation, all the while knowing that such calls were being made in violation of the TCPA.[3]

  **2. Lifewatch and its agents made robo-calls to Mr. Salam and other members of the class without their prior express consent.**

As alleged in the Complaint (Docket No. 1:13-cv-9305) (attached as Exhibit I) and as confirmed at Mr. Salam's deposition (attached as Exhibit J), on December 12, 2013, Mr. Salam received a call on his wireless telephone. Ex. I at ¶ 12; Ex. J at 6:20-7:2. Upon answering the call, a prerecorded message and/or artificial voice stated that the call was regarding the sale of

---

[3] *See also Life Alert Emergency Response, Inc. v. Lifewatch, Inc.*, 601 F. App'x. 469, 474 (9th Cir. Feb. 4, 2015) ("At bottom, Lifewatch would have us believe that any infringement is traceable to actions by telemarketers for which it has no responsibility. The district court did not buy this story of telemarketers-gone-rogue, and neither do we.")

5

medical alert devices.  Ex. I at ¶ 14; Ex. J at 32:15-17.  The message directed Mr. Salam to push "1" to speak to a representative.  Ex. I at ¶ 15; Ex. J at 35:13-14.  It was during the course of the phone call that Mr. Salam learned that Lifewatch was the seller of the devices.  Ex. I at ¶ 16; Ex. J at 37:1-4.  Mr. Salam did not give Lifewatch or any other telemarketer prior express consent to make calls to his wireless account.  Ex. J at 61:8-9.  Mr. Salam's experience is representative of the experience of other consumers who received robo-calls from Lifewatch, all of whom suffered the same injury as Mr. Salam.

For example, Diana Mey, another putative class member, owns two wireless phone numbers, both of which have been on the Do Not Call Registry since 2003 and 2004.  Ex. G at ¶ 3.  Ms. Mey's affidavit details a number of robo-calls that she received involving a pre-recorded message from Lifewatch between October 2013 and January 2015 on her wireless phones, each of which offered to sell her a medical alert device and encouraging her to press "1" in order to speak to a salesperson.  These calls were made to Ms. Mey's wireless phones despite the numbers being on the Registry and the fact that she never requested information on medical alert devices.  *See generally* Ex. G.

### 3. Lifewatch benefitted from the robo-calling campaign.

Although Lifewatch engages telemarketers to develop customers for its medical alert devices, it is Lifewatch, not the telemarketer, which receives and processes the consumers' payments.  Exhibit K: Defendant's Rule 26(a) Disclosures at Exhibit A, ¶ 5.3 (exemplar telemarketing services contract); Ex. E at ¶ 7.  And the payments are quite hefty – Defendant's marketing campaign often offered medical monitoring devices "valued at $400" for "free" to the elderly, and, in exchange, Lifewatch received a monthly monitoring fee, ranging from $19.95 to $39.95 per month.  *See* Exhibit M, FTC PX 2 (France Decl.), Att. A, at 6, Att. F at 5 (value over

6

$400); Exhibit N, FTC PX 3 (Tyndall Decl.), Att. A at 22, 25 (system will cost $400 plus monitoring charges if consumer does not sign up during call).

Although the payment arrangements between Lifewatch and its telemarketers have not been specifically disclosed by Lifewatch, *see* Exhibit K, Lifewatch Inc.'s Initial Rule 26(a) Disclosures at ¶ 5.4 (stating that payment terms will be agreed to "from time-to-time," but not producing any such terms), it is logical to presume that if Lifewatch is paying its telemarketers, Lifewatch is also financially benefitting from the scheme.  By way of example:

- From March 2012 through May 2013, Lifewatch paid Worldwide Info Services, Inc., $8,269,193.50;

- From May 2013 through December 2013 Lifewatch paid Global Interactive Technologies, Inc., another telemarketer, $3,000,277.10; and

- From June 2013 through December 2013, Lifewatch paid American Innovative Concepts, Inc., yet another telemarketer, $3,797,405.90.

Ex. F at 6; *see also* Ex. A, Att. I at ¶ I.5 (Lifewatch Inc.'s Response to Civil Investigative Demand Pursuant to Section 20 of the Federal Trade Commission Act, 15 U.S.C. § 57b-1, identifying telemarketers).  Moreover, the robo-calling scheme added approximately 8000 customers a month to Lifewatch's bottom line.  Ex. D, at ¶ 13.  Given that Lifewatch is a for-profit corporation that appears to still be in business,[4] it stands to reason that Lifewatch has benefitted and continues to benefit from its robo-calling scheme.

## ARGUMENT

### I.      The TCPA

The TCPA is a consumer-protection statute Congress enacted after finding that robo-calls had become a serious problem, posing a nuisance and invading the privacy of telephone subscribers nationwide. *See* TCPA, 47 U.S.C. § 227 note; *see also* 105 Stat. 2394 § 2(10). To

---

[4] Lifewatch's website was last visited on November 25, 2015.  http://www.lifewatch-usa.com/.

address this issue, Congress prohibited callers from using automated telephone dialing systems or artificial or prerecorded voice messages to contact cellular customers without the prior express consent of the called party.[5]   Congress also granted a private right of action with statutory damages for victims of illegal calls, to facilitate both public and private enforcement. *See* 47 U.S.C. § 227(b). Despite these measures, however, illegal robo-calling has persisted as a low-cost, high-volume way of attempting to contact consumers, and continues to skate the edges of federal and state law.[6] The FTC records complaints from consumers who have registered their numbers on the National Do Not Call Registry ("NDNCR"), but have received telemarketing calls on their cell phones or landline phones anyway.[7]   Despite the enactment of the NDNCR in 2003, there were still over 3 million consumer complaints made to the FTC in 2014 alone.[8]

In order to prevent the type of attempted circumvention of the law that is at issue in this case—where profitable businesses hire others in an effort to obscure the illegal nature of their robocalls marketing campaigns—the FCC recently ruled that companies may be held vicariously liable for calls made on their behalf, in a wide variety of situations, including when the companies knowingly benefit from the calls. *See In the Matter of the Joint Petition Filed by Dish Network, LLC, the United States of Am., & the States of California, Illinois. N. Carolina, & Ohio for Declaratory Ruling Concerning the Tel. Consumer Prot. Act (TCPA) Rules*, 28 F.C.C.R.

---

[5] The TCPA also precludes callers from using an artificial or prerecorded voice to deliver a message to residential telephone lines.

[6] *See* Prepared Statement of The Federal Trade Commission "Stopping Fraudulent Robocalls: Can More Be Done?", before the Committee on Commerce, Science and Transportation, Senate, 113th Congress 8 (2013), *available at* https://www.ftc.gov/sites/default/files/documents/public_statements/prepared-statement-federal-trade-commission-entitled-%E2%80%9Cstopping-fraudulent-robocall-scams-can-more-be/130710robocallstatement.pdf (last visited Oct. 13, 2015) (describing complex systems through which telemarketers attempt to circumvent the law by involving third parties to obtain lead lists, voice recordings, and autodialing services).

[7] Federal Trade Commission, *National Do Not Call Registry Data Book FY 2014*, at 8 (Nov. 19, 2014) *available at* https://www.ftc.gov/system/files/documents/reports/national-do-not-call-registry-data-book-fiscal-year-2014/dncdatabookfy2014.pdf (last visited Oct. 13, 2015).

[8] *Id.*

8

6574, 6588 (2013). As the FCC explained:

> [T]he seller is in the best position to monitor and police TCPA compliance by third-party telemarketers. We thus agree that, consistent with the statute's consumer protection goals, potential seller liability will give the seller appropriate incentives to ensure that their telemarketers comply with our rules. By contrast, allowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions. This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside the United States, as is often the case.

*Id.*; *see also id.* at 6593 ("we see no reason that a seller should not be liable under those provisions for calls made by a third-party telemarketer when it has authorized that telemarketer to market its goods or services. In that circumstance, the seller has the ability, through its authorization, to oversee the conduct of its telemarketers, even if that power to supervise is unexercised.").[9]

Courts routinely certify class actions to remedy telemarketing campaigns that systematically violate the TCPA, such as in this instance, and this Court should do the same here. *See e.g. Birchmeier v. Caribbean Cruise Line, Inc.*, 302 F.R.D. 240, 250 (N.D. Ill. 2014) (certifying a class of plaintiffs which alleged that defendants made or benefitted from robocalls that "utilized a prerecorded voice to send the same type of message, from the same person, using the same technology"); *see also Agne v. Papa John's Int'l*, 286 F.R.D. 559, 572 (W.D. Wash. 2012) (certifying class for "resolving the claims of consumers who received text message advertisements [calls] sent by or at the instruction of the Defendants"); *Turza*, 2013 WL 4506176

---

[9] This Court and other courts within this District agree that such vicarious liability is necessary to enforce the TCPA. *See, e.g., Savanna Grp., Inc. v. Trynex, Inc.*, No. 10 C 7995, 2013 WL 4734004, at *4-6 (N.D. Ill. Sept. 3, 2013) (explaining that in Dish Network the FCC determined that a "'seller'—who does not generally 'initiate' calls within the meaning of the TCPA—may nevertheless be vicariously liable under federal common law agency principles for violations of either § 227(b) or § 227(c) committed by third-party telemarketers" and further holding that the FCC's "ruling concerning violations of § 227(b) [] is controlling").

(affirming class certification in blast fax case involving mixed advertisement and information material).

## II.     The Applicable Legal Standard for Class Certification under Rule 23

A class should be certified as long as it is readily ascertainable and satisfies all of the requirements of Rule 23(a) and at least one of the requirements of Rule 23(b). *See, e.g., Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 808 (7th Cir. 2012).  Under Rule 23(a), the movant must demonstrate four requirements: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. *See* Fed. R. Civ. P. 23(a).  Additionally, Rule 23(b)(3)—the prong under which Plaintiff seeks to certify the Class here—requires Plaintiff to show that "questions of law or fact common to the members of the class predominate over any questions affecting individual members, and [that] a class action is superior to other available methods for the fair and efficient adjudication of the controversy."  *See* Fed. R. Civ. P. 23(b)(3); *see also Messner*, 669 F.3d at 808. As fully explained below, the Proposed Class satisfies all the foregoing requirements and should be certified.

## III.     The Proposed Class is Readily Ascertainable

As an initial matter, and though it is not explicitly provided for in Rule 23(a), courts require that a proposed class be sufficiently definite, or "ascertainable."  *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 657 (7th Cir. 2015); *Hinman v. M and M Rental Ctr., Inc.*, 545 F. Supp. 2d 802, 806 (N.D. Ill. 2008) (citing *Alliance to End Repression v. Rochford*, 565 F.2d 975, 977 (7th Cir. 1977)).  Rejecting any heightened requirements for ascertainability, the Seventh Circuit held simply that the class "must be defined clearly" and membership in the class can be determined by "objective criteria," in order for the proposed class to satisfy this requisite. *Mullins*, 795 F.3d at 657; *see also Hinman*, 545 F. Supp. 2d at 806 (A class is sufficiently

10

definite "if its members can be ascertained by reference to objective criteria.") The goal of Rule 23's implicit ascertainability requirement is not to determine the actual identities of individual class members, but to ensure that class members generally "receive the best notice practicable and have an opportunity to opt out." MAN. FOR COMPLEX LITIG. (4th ed. 2004) § 21.222 at 270. As a result, Plaintiff "need not identify each class member to secure class certification," *Lau v. Arrow Fin. Servs., LLC*, 245 F.R.D. 620, 624 (N.D. Ill. 2007), and a class is sufficiently ascertainable where its "scope is defined by the activities of the defendants." *Rochford*, 565 F.2d 975 at 978; *see also Hinman*, 545 F. Supp. 2d at 806.

Here, class membership is straightforward and turns on simple and objective criteria: If an individual's cellular telephone number was called by, on behalf of, or for the benefit of Lifewatch, using an automated telephone dialing system or artificial or prerecorded message, from October 16, 2013 to the present, then he or she is a member of the Proposed Class. *See Knutson v. Schwan's Home Serv., Inc.*, 2013 WL 4774763, at *5 (S.D. Cal. Sept. 5, 2013) (finding the proposed class ascertainable because "[w]hether a customer received an autodialed or artificial/prerecorded call may be determined objectively."). Because the class definitions are based upon Defendant's standard course of conduct, the Proposed Class can be easily ascertained.

## IV. The Class Satisfies Rule 23(a)

### A. Numerosity

The first express requirement of Rule 23(a)(1) requires that the class be so numerous that joinder of all members in a single action is impracticable. Fed. R. Civ. P. 23(a)(1). Generally a class of forty or more satisfies this requirement. *Hinman*, 545 F. Supp. 2d at 805; *see also McCabe v. Crawford & Co.*, 21 F.R.D. 631, 642 (N.D. Ill. 2002). Plaintiff is not required to

11

allege either the exact number or identify of the members of the Proposed Class; rather, a putative class may rely on "common sense assumptions" to meet the numerosity requirement. *Hinman*, 545 F. Supp. 2d at 806.

Here, the evidence against Lifewatch indicates that just one of its telemarketers sent out nearly two million pre-recorded calls per day, six days a week. *See* Ex. B, at ¶¶ 4, 7. Approximately 800,000 to 900,000 of those calls were connected. *Id.* at ¶ 7. Another telemarketer stated that it "cycled through" about 10,000 numbers a day. *See* Ex. A, Att. XX at 20:13-24. In fact, in 2013 alone, Lifewatch had contracts with at least <u>22</u> different telemarketers.[10] Moreover, by using robo-calling to obtain its customers, Lifewatch added approximately 8,000 new customers to its inventory each month. Ex. D, at ¶ 13. Although these values do not distinguish between calls made to landlines or cell lines, there is no question that wireless customers other than Mr. Salam were receiving such calls even when such phone numbers were registered with the Do Not Call Registry. *See, e.g.,* Ex. G (consumer received multiple Lifewatch robocalls on two wireless numbers registered with Do Not Call Registry).

Given the volume of robo-calls identified above, common sense dictates that there is a class of at least 40 wireless consumers who received uninvited calls from Lifewatch during the Class Period.

## B. Commonality

To satisfy the commonality requirement of Rule 23(a)(2), Plaintiff must identify "a common contention" that is "capable of classwide resolution." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 (1982)). That is, "determination of [the contention's] truth or falsity will resolve an issue that is central to

---

[10] Plaintiff has not attached copies of the contracts (SAL-LW-00001 – 00389) produced by Lifewatch due to their volume.

12

the validity of each one of the claims in one stroke." *Id.; see also Mullins*, 795 F.3d at 673

("Nothing more is required to satisfy Rule 23(a)(2).").

Commonality is present where there is "a common nucleus of operative fact," *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992), and is often found where "defendants have engaged in standardized conduct toward members of the proposed class." *Whitten v. ARS Nat'l Servs. Inc*., No. 00 C 6080, 2001 WL 1143238, at *3 (N.D. Ill. Sept. 27, 2001). Satisfying commonality is a relatively low hurdle and "does not require that all or even most of the issues in the litigation be common issues…one common issue is enough." *Adams v. R.R. Donnelley & Sons*, 2001 U.S. Dist. LEXIS 4247 at *21(N.D. Ill. Apr. 6, 2001) (citing *Meiresonne v. Marriott Corp.*, 124 F.R.D. 619, 622 (N.D. Ill. 1989). In determining whether commonality is satisfied, the Court focuses on whether the defendant's conduct was common as to all of the class members, and not on whether each plaintiff has a "colorable" claim. *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 299-300 (3d Cir. 2011).

Here, there are multiple common questions. To start, Plaintiff's and Class's claims rely on a single contention arising out of a common nucleus of operative facts: Lifewatch violated the TCPA by placing, causing to be placed, or benefitting from robo-calls made to wireless numbers utilizing a prerecorded voice or an automated telephone dialing system without the recipient's prior express consent.[11] If Lifewatch is found liable, each Class member has suffered the same injury and is entitled to statutory damages under the TCPA.

This common nucleus of operative facts gives rise to several common and controlling factual and legal questions that will resolve each class members' TCPA claims against

---

[11] *See Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998) ("Common nuclei of fact are typically manifest where . . . the defendants have engaged in standardized conduct towards members of the proposed class.").

Defendant in one stroke, including:

- Whether Lifewatch, or someone acting on its behalf, placed the calls in question using an automated telephone dialing system as contemplated by the TCPA;

- Whether Lifewatch, or someone acting on its behalf, placed calls in question using an artificial or prerecorded message as contemplated by the TCPA;

- Whether Lifewatch's conduct constitutes a violation of the TCPA;

- Whether Lifewatch can establish prior express consent as an affirmative defense;

- Whether Plaintiff and the Class are entitled to actual, statutory, or other forms of damages, and other monetary relief;

- Whether Plaintiff and the Class are entitled to treble damages based on the willfulness of Lifewatch's conduct; and

- Whether Plaintiff and the Class are entitled to equitable relief.

Accordingly, the requirement of commonality is satisfied.

## C. Typicality

The purpose of Rule 23(a)(3)'s typicality inquiry is to ensure that the named plaintiffs will be proving the class members' claims as they pursue their own. *See De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983) (typicality inquiry asks "whether the named representatives' claims have the same essential characteristics as the claims of the class at large"). A named plaintiff's claim is typical if it "arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *See id.* (internal quotation omitted). Commonality and typicality overlap, and a finding of one usually results in a finding of the other. *Id.*; *see also Hinman*, 545 F. Supp. 2d at 806.

Here, the similarity between "essential characteristics" of Plaintiff's claims and those of the Class he seeks to represent are more than significant—they are practically identical. First,

14

each of the Plaintiff's and Class members' claims result from the exact same conduct—Lifewatch's unsolicited, automated calls to wireless customers (or calls made on its behalf) using an automated telephone dialing system or artificial or prerecorded message. Moreover, all of the calls had the same purpose—to generate sales of medical device monitoring services which would profit Lifewatch. As a result, Plaintiff's rights under the TCPA were violated by the same common course of conduct to which Lifewatch subjected every other putative class member, and Plaintiff suffered the exact same injury as all other class members. *See also* Ex. G (wireless customer exposed to same course of conduct and suffered same type of injury). As such, Plaintiff's claims satisfy the typicality requirement of Rule 23(a).

## D. Adequacy

Finally, Rule 23(a)(4) requires that the class representatives "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This inquiry "consists of two parts: (1) the adequacy of the named plaintiffs as representatives of the proposed class's myriad members, with their differing and separate interests, and (2) the adequacy of the proposed class counsel."

*Gomez v. St. Vincent Health, Inc.*, 649 F.3d 583, 592 (7th Cir. 2011).

A named plaintiff will be adequate so long as his or her claims are not "antagonistic or conflicting . . . with other members of the class," and he or she has a "sufficient interest in the outcome of the case to ensure vigorous advocacy." *Maxwell v. Arrow Fin. Servs., LLC*, Case No. 03-c-1995, 2004 WL 719278, at *5 (N.D. Ill. Mar. 31, 2004). For their part, class counsel are "adequate" if they are competent and have the resources necessary to sustain the complex litigation necessitated by class claims. *See Gomez v. Ill. State Bd. of Educ.*, 117 F.R.D. 394, 401 (N.D. Ill. 1987).

15

Plaintiff and his Counsel are undoubtedly adequate to represent the Proposed Class in this case. First, Plaintiff has the same interests as the other members of the proposed Class. Mr. Ismael, like every other member of the Class he seeks to represent, received unsolicited telemarketing calls from Defendant in violation of the TCPA. *See* Deposition of Ismael Salam ("Salam Dep.") at 6:16-24. He shares the same interest in ensuring that Lifewatch's conduct does not continue in the future, and in recovering the statutory damages to which they are entitled. Plaintiff has vigorously prosecuted this case by responding to sets of written discovery, providing Lifewatch with documents, and sitting for a deposition in Chicago, and will continue to do so. *See id.* at 3:1-11. Mr. Ismael has an even greater understanding of what is required of a Plaintiff as a Class Representative because he is an attorney admitted to practice in Illinois, and has tried and is currently involved in the prosecution of several class action lawsuits. *See id.* at 8:7-8, 11:2-3. Mr. Ismael has affirmatively committed himself to acting in the Class's best interests at all times. *See id.* at 45:13, 49:11, 50:12-15. None of Mr. Ismael's other cases or interests are antagonistic to those of the Class. *See id.* 51:25 (Mr. Salam has not been party to any settlement negotiations); 52:15 (Mr. Salam does not recall discussing any kind of settlement with class counsel, whether individual or classwide); 57:24-58:11 (Mr. Salam is unaware of any kind of fee-sharing agreements between any counsel connected to the case on the plaintiffs' side); *see also* Disclosure Statement, *Salam v. Lifewatch, Inc.*, Case No. 1:13-cv-09305, Dckt. No. 52 (Feb. 2, 2015) (statement by the plaintiff laying out cases in which Lite DePalma Greenberg, LLC and Siprut P.C. are involved together, and establishing that Mr. Salam does not serve as counsel on any of those matters).

Plaintiff has retained experienced and skilled counsel will continue to adequately represent the interests of the Class. Counsel Katrina Carroll, of Lite DePalma Greenberg, LLC

16

("Lite DePalma"), is a member in good standing of the Illinois and New Jersey Bars and the United States District Courts of the Northern District of Illinois and District of New Jersey. During her time at Lite DePalma, she has recovered more than $1 billion for aggrieved consumers, investors and businesses. She currently serves as court-appointed co-lead counsel on behalf of consumers in *McCain et al. v. Rust-Oleum* (N.D. Ill.) (products liability); co-lead counsel in *Lewert v. P.F. Chang's China Bistro, Inc.* (N.D. Ill.) (data breach); co-lead counsel in *Mednick v. Precor Inc.* (N.D. Ill) (product defect); as plaintiffs' counsel in *Automotive Wire Harness Systems Antitrust Litigation* (D. Mich.) (antitrust). Details regarding Ms. Carroll's track record and that of her firm demonstrate their commitment to plaintiffs' class litigation, show that they have the financial resources to represent the class and will commit more than sufficient resources to litigate this action to its conclusion. A copy of the Firm's resume is attached hereto as Exhibit O. It also demonstrates that Lite DePalma routinely and seamlessly works with co-counsel in large litigation matters. Ms. Carroll and her firm will do so in this case, and after a thorough review, have concluded that they hold no interests which are adverse to the putative class.

Counsel Peter S. Lubin, of DiTommaso Lubin P.C., is a member in good standing of the Illnois Bar, the United States District Courts of Illinois (Northern, Southern and Central Districts), Maryland, and the Western District of Michigan, as well as several U.S. Courts of Appeal and the Supreme Court of the United States. Mr. Lubin and Mr. DiTommaso have been named lead or co-lead class counsel in hundreds of certified class actions which were either certified after a contested hearing or for settlement purposes. Current representative cases include *Boundas v. Abercrombie & Fitch* (N.D. Ill.) (breach of contract and consumer protection) and *Booking Fee Class Actions* (N.D. Ill.) (civil rights). Mr. Lubin and Mr.

17

DiTomaso have also represented plaintiffs in a number of class actions involving alleged violations of the TCPA in various Illinois Circuit Courts (*Junk Fax Class Actions*) and reached a favorable settlement.   In addition, the attorneys at DiTommaso-Lubin have substantial experience defending class actions, representing consumers in individual consumer fraud cases and representing businesses, including multi-national corporations, banks or other businesses in large and complex business disputes.   Copies of the Firm's resume and Mr. Lubin's detailed biography are attached hereto as Exhibit P.   DiTommaso Lubin have sufficient resources to represent the class, and after a thorough review, have concluded that they hold no interests which are adverse to the putative class.

Thus, Plaintiff and his counsel are more than adequate to represent the proposed Class. All requisites for certification of the class under Rule 23(a) are satisfied.

**V.      The Class Satisfies Rule 23(b)(3)**

The Class also satisfies the dual requirements of Rule 23(b)(3): class-wide issues predominate, and a class action is the superior method to handle this lawsuit.

**A.      Predominance**

Rule 23(b)(3)'s "predominance requirement looks to whether the proposed class is 'sufficiently cohesive' to warrant 'adjudication' by representation." *Williams-Green v. J. Alexander's Restaurants, Inc.*, 277 F.R.D. 374, 383 (N.D. Ill. 2011) (citing *Dukes*, 131 S. Ct. at 2566)).   This does not mean, however, that individual issues need be entirely absent. Rather, "[c]ourts in this district agreed that the presence of some limited issues requiring individual inquiry do not defeat predominance." *Savanna Grp., Inc. v. Trynex, Inc.*, No. 10-CV-7995, 2013 WL 66181, at *15 (N.D. Ill. Jan. 4, 2013).   As such, "[p]redominance is satisfied where common evidence may prove the class member's claims," even in the presence of limited individual

18

issues. *Id.* (citation omitted).

Here, the foregoing discussion regarding commonality and typicality demonstrates that the claims of Plaintiff and the Proposed Class arise out of a common course of conduct. As discussed above, Lifewatch employed uniform practices with regard to each Proposed Class member: (i) it placed (or caused its telemarketers to place) calls using an automated telephone dialing system and/or used artificial or prerecorded messages, (ii) each call was designed to sell Lifewatch's monitoring services, and (iii) each call was made without the call recipient's prior express consent. Where, as here, "a class challenges a uniform policy or practice, the validity of that policy or practice tends to be the predominant issue in the ensuing litigation." *Kernats v. Comcast Corp.*, 2010 WL 4193219, at *8 (N.D. Ill. October 20, 2010); *Streeter v. Sheriff of Cook County*, 256 F.R.D. 609, 614 (N.D. Ill. 2009) (same); *Young v. County of Cook*, 2007 WL 1238920, at *7 (N.D. Ill. Apr. 25, 2007) (same). As such, Plaintiff's and the Class's claims will be subject to common proof, and this litigation is well-suited to the class action process.

Furthermore, the relief sought is identical in each Class member's case. The TCPA provides a statutory damages award of $500 for each violation of the Act. 47 U.S.C.§ 227(b)(3)(C). Each member of the Class is seeking the same statutory damages, the only difference between claims being the number of times a Class member was called, allowing damages to be easily calculated. *Cf. Mullins*, 795 F.3d 670-671 ("a common method for showing individual damages—a simple formula [that] could be applied to each class member's employment records … would be sufficient for the predominance and superiority requirements to be met"). As the relief sought will be identical for each Class member, and the form of evidence to prove such violations will be common among Class members, the relief sought lends itself towards the class action model, and the issues of law and fact in the case predominate over any

19

and all other matters individual to each Class member.

### B. Superiority

Finally, to proceed as a class action under Rule 23(b)(2), the district court must find that a class action is the superior method to resolve the Plaintiff's and the Proposed Class' claims. *See* Fed. R. Civ. P. 23(b)(3). The rule provides the following nonexclusive list of factors pertinent to a finding of superiority, including:

- the interest of members of the class in individually controlling the prosecution or defense of separate actions;
- the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; and
- the difficulties likely to be encountered in the management of a class action.

Fed.R.Civ.P. 23(b)(3).[12] Courts also look to whether alternative methods of dispute resolution are reasonably available and compare them to the class action device. *See, e.g., Mullins v. Direct Digital,* LLC, 795 F.3d 654, 664 (7th Cir. 2015).

In TCPA cases where, like here, there are a large number of plaintiffs with similar claims and relatively small individual recoveries,[13] courts in this District frequently conclude that a class action is superior to other methods of adjudicating such claims. *See, e.g., Chapman v. Wagener Equities, Inc.*, 2014 U.S. Dist. LEXIS 16866, *58 (N.D. Ill. Feb. 11, 2014) (class action superior method of adjudicating TCPA claims because of large number of plaintiffs, similarity of claims, and small individual recoveries; *Savanna Group, Inc. v. Trynex, Inc.*, 2013 U.S. Dist. LEXIS 1277, *52-53 (N.D. Ill. Jan. 4, 2013) (same); *G.M. Sign, Inc. v. Finish Thompson, Inc.*, 2009 U.S. Dist. LEXIS 73869, *19-20 (N.D. Ill. Aug. 20, 2009) (same). Where there are a large number of

---

[12] The other pertinent factor, "the desirability or undesirability of commencing the litigation of the claims in the particular forum," is neutral in this litigation.

[13] The TCPA provides for statutory damages in the amount of $500 per violation; it costs a plaintiff $400 (including a $50 administrative fee) to merely file a claim in federal court, much less litigate it.

20

plaintiffs, "it is impossible to imagine individual lawsuits," making "disposition by class action … an efficient use of judicial resources." *Chapman*, 2014 U.S. Dist. LEXIS 16866, at *58. Moreover, where there is small potential recovery for individual plaintiffs, there is little incentive for a plaintiff to bring an individual action; indeed, many plaintiffs may not even bring such claims. *See G.M Sign*, 2009 U.S. Dist. LEXIS 73869, at *19; *see also Pastor v. State Farm Mut. Auto. Ins. Co.*, 487 F.3d 1042, 1047 (7th Cir. 2007) ("The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights."). This case falls squarely within this reasoning.

In addition, although some potential class members have commenced litigation against Lifewatch, for the most part these claims appear to have been settled, *see* Ex. A (FTC PX 1, Att. K) or voluntarily dismissed (based on a recent review of the dockets). The only remaining federal cases brought by consumers against Lifewatch for violations of the TCPA are (i) *Salam v. Lifewatch, Inc.*, Case No. 13-cv-9305 (N.D. Ill.), and (ii) *Bank v. Lifewatch, Inc.*, Case No. 15-cv-2278 (E.D.N.Y.). The *Salam* litigation involves a class of consumers who received robocalls to their <u>cellular</u> phones, not landlines, and thus implicates an entirely different class. The *Bank* litigation asserts two classes, a nationwide class of consumers who received robocalls to either landlines or cellular numbers under the TCPA, as well as a class under New York state law, and a class period from 4/22/11-4/22/15. Coordination of these actions was rejected by the Judicial Panel on Multidistrict Litigation. Exhibit Q, *In re: Lifewatch, Inc. Telephone Consumer Protection Act (TCPA) Litig.*, MDL No. 2653 (Docket No. 27). Accordingly, the *Salam* and *Bank* litigation should not present an obstacle to class certification here.

Finally, manageability of this matter as a class action does not pose any particular

21

difficulties.  The experience of Plaintiff's counsel in suits of this kind speaks to their ability to manage a class of the expected size here.  *Supra*.  Moreover, "[i]t should be kept in mind that management difficulties, like other superiority factors, must be judged in comparison to the fairness and efficiency of other available methods for adjudicating the controversy…." 2 Newberg on Class Actions, supra, § 4:35 (discussing difficulties in notifying the class members as a potential management difficulty).  Accordingly, a class action is superior to other methods for the fair and efficient adjudication of the controversy.

## CONCLUSION

For the reasons set forth above, Plaintiff respectfully requests that the Court enter an order (i) certifying the Proposed Class, (ii) appointing Plaintiff as the respective Class Representatives, (iii) appointing Katrina Carroll of Lite DePalma Greenberg, LLC and Peter Lubin of DiTommaso Lubin P.C. as Co-Lead Class Counsel, and (iv) granting any such further relief as this Court deems reasonable and just.

Dated: December 1, 2015                              Respectfully submitted,

By:     */s/ Katrina Carroll*
        Katrina Carroll, Esquire
        **LITE DEPALMA GREENBERG, LLC**
        *kcarroll@litedepalma.com*
        211 W. Wacker Drive
        Suite 500
        Chicago, IL 60606
        312.750.1265

By:     */s/ Peter S. Lubin*
        Peter S. Lubin, Esquire
        **DITOMASSO LUBIN P.C.**
        17W 220 22nd Street
        Suite 410
        Oakbrook Terrace, IL  60181
        630.333.0002
        Fax: 630.333.0333

22