UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

-------------------------------------------------------------------------------- x

ISMAEL SALAM, individually and on behalf of all
others similarly situated,

Case No.: 1:13-cv-9305

Hon. Charles R. Norgle,
Sr.

Plaintiffs,

v.

LIFEWATCH, INC., a New York corporation

Defendants.

-------------------------------------------------------------------------------- x

### DECLARATION OF SARAI BAKER

I, Sarai Baker, of full age, declare as follows under penalties of perjury:

1. I am Lifewatch's Director of Operations. I am a New York resident. I have personal knowledge of the facts set forth herein, which are known by me to be true and correct. The attachments annexed hereto are true and accurate copies.

2. Lifewatch is a decades-old New York company that is proud of its reputation for providing high-quality products and services to elderly, seriously ill, and disabled individuals.

3. By simply pressing a button on a Lifewatch medical alert device, Lifewatch's customers have immediate access to emergency services.

4. Lifewatch did not and does not make or initiate telemarketing calls. Nor does Lifewatch create, generate, or circulate recorded telephonic marketing messages.

5. Beginning in approximately 2012, Lifewatch began entering into Purchase Agreements with various outside sale companies. (Attachment 1, Purchase Agreement template)

6. Pursuant to these Purchase Agreements, the outside companies originate customer accounts (through radio, television, internet, and print advertising, as well as telemarketing) and then offer to sell those accounts to Lifewatch --and others -- on a non-exclusive basis.

7. The outside companies that sign these Purchase Agreements warrant and covenant within the Purchase Agreements that they do not and will not violate any state or federal telemarketing laws, or any other laws in originating customer accounts.

8. Lifewatch insists that in conjunction with signing the Purchase Agreement -- wherein the outside company warrants and covenants that it will not engage in unlawful activities, including violative telemarketing practices -- each outside company signs an affidavit wherein it affirms that, among other things, they strictly comply with all state and federal telemarketing laws (Attachment 2).

9. Lifewatch has learned that some of the same outside companies that sell customer accounts to Lifewatch also sold and continue to sell customer accounts to Lifewatch's competitors. Lifewatch routinely receives communications from entities offering to originate customer accounts for Lifewatch. Those entities have provided Lifewatch with information indicating that they originate customer accounts for Lifewatch's competitors.

10. Lifewatch does not have information relative to who, if anyone, received telemarketing calls (with pre-recorded messages).

11. If, hypothetically, an outside seller from which Lifewatch purchased 10 customer accounts made 1000 violative telephone calls, Lifewatch would only have contact information for the 10 customers it purchased from the outside seller. Moreover, Lifewatch would have no information as to whether those 10 customers were originated by the outside sellers through telemarketing or, for instance, because the customer was responding to a print advertisement or television advertisement.

12. A review of our records revealed that Lifewatch last obtained a customer account from Worldwide Info Services in May 2013.

I declare under penalty of perjury that the foregoing is true and accurate to the best of my knowledge.

Dated: 12/30/15

SARAH BAKER

# ATTACHMENT 1

## PURCHASE AGREEMENT

This Purchase Agreement (the "Agreement") is entered into as of this ███████ ███ by and between **LifeWatch Inc. d/b/a LifeWatch USA** (the "Company"), a New York corporation, and █████████████████████ and its affiliates and subsidiaries (the "Seller"), a Florida limited liability company.

### WITNESSETH:

WHEREAS, the Company is engaged in the business of selling a medical alert system consisting of various medical alarm plans and related safety products (the "Products");

WHEREAS, the Seller is engaged in the business of entering into contracts for its own account with customers for a wide variety of products and services, including selling medical alert systems and related plans (the "Contracts") and selling such Contracts for its own account to various purchasers, including but not limited to the Company; and

WHEREAS, the Company and the Seller wish to define the terms and conditions governing all of the Contracts, if any, that the Company may purchase from the Seller.

NOW, THEREFORE, in consideration of the premises and mutual covenants, contained in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.     <u>DESCRIPTION OF THE PURCHASE ARRANGEMENTS</u>. Throughout the Term of this Agreement (as defined below), the Seller shall operate in accordance with the following:

    (a)    Seller shall use its best efforts to originate Contracts for its own account and to offer to sell Contracts for the Products to the Company and to others on a non-exclusive basis at a prices and terms to be mutually agreed upon from time-to-time;

    (b)    Seller shall not contact any current or future customers of the Company or any other person listed on any local, federal or state "do not call" registry in accordance with Section 6.2 herein;

    (c)    In originating Contracts for its own account, the Seller's telemarketing activities (as hereinafter defined) shall be conducted in accordance with all applicable federal, state and local laws, rules and regulations ( collectively "Telemarketing Laws"). As used in this Agreement, "Telemarketing", shall have the meaning ascribed to it in subsections 310.2 (cc) and (dd) of the federal Telemarketing Sales Rule, 16 C.F.R. Part 310; direct mail solicitation via the

U.S. Postal Service, facsimile transmission, electronic mail, text messages accessed by mobile phone or sent directly to mobile phones, television and radio; and internet marketing; and

    (d)    The Seller shall record, or cause the recording of, all sales calls made by its employees, agents or representatives and retain all recordings (i) for not less than twenty four (24) months from the date each recording is made, and (ii) shall make all such recordings available to the Company for its review at any time; and

    (e)    The Seller shall comply, or cause the compliance, with all local, state and federal regulations, including 47 U.S.C.A. § 227, which prohibits the use of automatic telephone dialing systems.

    1.1    <u>Verification of Acceptance and Payment for the Products</u>. If a consumer enters into a Contract that Seller intends to offer to Company for the consumer's use of the Products, among other things, the Seller shall obtain the consumer's express verifiable authorization prior to causing billing information to be submitted for payment, or collecting the consumer's payment information for the Products, except when the method of payment used is a credit card subject to the protections of the Truth in Lending Act (15 U.S.C. § 1601 et seq.) and Regulation Z (12 C.F.R. part 226), or a debit card subject to the protections of the Electronic Fund Transfer Act (15 U.S.C.§ 1693 et seq.) and Regulation E (12 C.F.R. part 205). Whatever Contracts the Seller decides to offer to sell to the Company shall be submitted to the Company's principal executive office for acceptance or rejection by the Company. A consumer's authorization to purchase the Product shall be deemed verifiable if any of the following means is employed:

    (a)    express written authorization by the consumer, which includes the consumer's signature;

    (b)    express oral authorization which is audio-recorded and made available upon request to the consumer and the consumer's bank or other billing entity, and which evidences clearly both the consumer's authorization for payment and the consumer's receipt of all of the following information:

        i.    The number of debits, charges, or payments (if more than one);
        ii.    The date(s) the debit(s), charge(s), or payment(s) will be submitted for payment;
        iii.    The amount of the debit(s), charge(s), or payment(s);
        iv.    The consumer's name;
        v.    The consumer's billing information, identified with sufficient specificity so that the consumer understands what account will be used to collect payment for the goods or services that are the subject of the telemarketing transaction;

vi.   A telephone number for consumer inquiry that is answered during normal business hours; and

vii.  The date of the consumer's oral authorization; or

(c)   Written confirmation of the transaction, identified in a clear and conspicuous manner as such on the outside of the envelope, sent to the consumer via first class mail prior to the submission for payment of the consumer's billing information, and that includes all of the information set forth above in subparagraphs 1.2(b) i-vii and a clear and conspicuous statement of the procedures by which the consumer can obtain a refund from the Company in the event the confirmation is inaccurate; provided, however, that this means of authorization shall not be deemed verifiable in instances in which the Products are offered in a transaction involving a free-to-pay conversion and pre-acquired account information.

1.2.   <u>Transfer of Consumer Information to the Company</u>.  Upon obtaining a consumer's acceptance and/or express verifiable authorization, such information shall be contained within the package of materials to be submitted by the Seller to the Company under this Agreement.

1.3.   <u>Costs of Performance</u>.  The Seller shall be solely responsible for all costs and expenses directly associated with performing its obligations under this Agreement, including compensation of its employees or independent contractors, advertising, office expenses, taxes and applicable governmental licensing.

1.4.   <u>Seller's Obligation to Replace Contracts</u>.  If there is a default within the first ninety (90) days of any of the Contract that is sold to the Company, the Seller shall replace such Contract with a similar Contract at no additional cost to the Company, or the Company may at its discretion deduct the amount paid for the contract from the seller's next payment.  Any sales that cancel within the first 90 days after initial payment and that doesn't generate a fourth payment (Monthly deals) or a second payment (Quarterly deals) will have the commission reversed.

2.   <u>TERM</u>.  The Term of this Agreement shall be effective as of <u>July 22, 2015</u> for a period of three (3) years from and after the execution of this agreement and shall be automatically renewed for consecutive one (1) year terms (the "Renewal Term") unless earlier terminated pursuant to this Agreement.

3.   <u>TERMINATION</u>.  Notwithstanding the Term or any Renewal Term, this Agreement may be terminated by either party effective immediately upon written notice to the other party if any of the following occurs:

(a)   a material breach of this Agreement by one party if the breaching party does not cure such breach within ten (10) days of receipt of written notice thereof;

(b)   in the event that a party: (i) commences a voluntary case or other proceeding

seeking liquidation, reorganization or other relief of its debts under any bankruptcy, insolvency, or other similar law now or hereafter in effect, that authorizes the reorganization or liquidation of such party or its debt or the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property; (ii) consents to any such relief or to the appointment of or taking possession by any such official in an involuntary case or other proceeding commenced against it; or (iii) makes a general assignment for the benefit of creditors, or becomes insolvent, or takes any corporate action to authorize any of the foregoing; or

(c)     in the event that any regulatory authority alleges that this Agreement or any aspect of it is in violation of any applicable law, rule or regulation, or in the event that a party is served with a notice from a federal or state governmental or regulatory authority that it has become the subject of an investigation by such authority.

4.     SELLER'S COVENANTS.

4.1     <u>Duty to Notify the Company of Complaints by Consumers.</u> Seller shall promptly provide written notice to the Company of any request it receives from a consumer for a refund, cancellation or chargeback. In addition, Seller shall promptly provide to the Company copies of any written complaints that it receives from consumers, Better Business Bureaus or governmental or law enforcement agencies.

4.2     <u>Compliance with Applicable Law.</u> The Seller shall at all times perform its obligations under this agreement in strict compliance with all applicable local, state and federal laws, as more fully described in Section 6 herein.

4.3     <u>Record Retention.</u> The Seller shall retain records establishing compliance with 16 C.F.R. 310.4(b)(4)(i)-(iii) and Seller shall maintain, for a minimum period of 24 months from the date the record is produced, the following records relating to its performance under this Agreement:

(a)     All substantially different advertising, brochures, telemarketing or text message scripts, and promotional materials;

(b)     The name and last known address of each prize recipient and the prize awarded for prizes that are represented, directly or by implication, to have a value of $25.00 or more;

(c)     The name and last known address of each customer, the goods or services purchased, the date such goods or services were shipped or provided, and the amount paid by the customer for the goods or services;

(d)     The name, any fictitious name used, the last known home address and telephone number, and the job title(s) for all current and former employees directly involved in telephone sales or solicitations; and

(e)     All verifiable authorizations or records of express informed consent or express agreement required to be provided or received under the Telemarketing Sales Rule promulgated by the Federal Trade Commission.

4.4     Seller Clients.  The Seller shall have the right to sell or offer to sell Contracts for the Products to any other purchaser and the Company shall have the right to purchase contracts for the Products from other sources and/or to originate such contracts by itself.

4.5     Covenant Not to Solicit.  During the Term of this Agreement and for a period of two (2) years following the termination of this Agreement, the Seller shall not contact any customer that is a party to any Contract sold by the Seller to the Company for purposes of selling any products that compete with the Company to the customer.  A breach of this section shall be deemed material and result in liquidated damages to company in the amount of one million dollars.

5.      COVENANTS OF THE COMPANY.

5.1     Fulfillment of Orders for Products.  The Company, or such third party as it may designate, shall be responsible for Fulfillment of each Contract that it purchases from the Seller. "Fulfillment" means the process of delivering the goods and services to the consumer along with any written agreement reflecting the terms of the transaction.

5.2     Customer Service.  The Company, or such third party as it may designate in writing, shall be responsible for providing Customer Service to consumers who are parties to the Contracts that the Company purchases from the Seller. "Customer Service" means answering telephone calls from consumers and processing any legitimate requests for refund or cancellation.

5.3     Processing of Payment for the Products.  The Company shall be responsible for processing payments from consumers after receiving consumers' billing information from the Seller.

5.4     Purchase Price.  The Company and the Seller shall agree from time-to-time on the purchase price for Contracts.

5.5     Compliance with Applicable Law.  The Company shall at all times perform its obligations concerning Contracts that it purchases in substantial compliance with all applicable local, state and federal laws, as more fully described in Section 6 herein.

6.    LEGAL COMPLIANCE REQUIREMENTS.

    6.1    Privacy Protection. The Seller shall not use any information that contains personal contact or other information that violates applicable law.

    6.2    Scrubbing of Leads. All Contracts originated or otherwise acquired or used by the Seller when originating a Contract must be "scrubbed" against the most current Federal Trade Commission ("FTC") "do-not-call" registry, any applicable state "do- not-call" list or registry The Seller will not contact any person included on any such list or registry.

    6.3    E-mail and Text Messages. The Seller shall consult the official list of wireless domain names published by the Federal Communications Commission (the "FCC") before sending e-mail and other electronic advertising to consumers. If an address on the Seller's mailing list includes a wireless Internet domain name on the FCC's official list, the advertiser cannot send ads to that address without getting the recipient's express prior consent.

    6.4    Use of Pre-Recorded Messages. The Seller. The Seller shall not initiate any outbound telephone call that delivers a prerecorded message unless it strictly complies with subsection 16 C.F.R. 310.4(b)(l)(v) of the Federal Telemarketing Sales Rule, which makes it an abusive telemarketing act or practice for the any person engaging in telemarketing activities, or engage in, the following conduct:

    (a)    Initiating any outbound telephone call that delivers a prerecorded message, other than a prerecorded message permitted for compliance with the call abandonment safe harbor in 16 C.F.R. 310.4(b)(4)(iii), unless:

        i.    in any such call to induce the purchase of any Products, the caller has obtained from the recipient of the call an express agreement, in writing, that:

            (a)    the caller obtained only after a clear and conspicuous disclosure that the purpose of the agreement is to authorize the caller to place prerecorded calls to such person;

            (b)    the caller obtained without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any Products;

            (c)    evidences the willingness of the recipient of the call to receive calls that deliver prerecorded messages by or on behalf of the caller; and

            (d)    includes such person's telephone number and signature, which "signature" may include an electronic or digital form of signature, to the extent that such form of signature is recognized as a valid signature under applicable federal law or state contract law.

        ii.    In any such call, to induce the purchase of any Product being sold by the Seller:

(a) The telephone is allowed to ring for at least fifteen (15) seconds or four (4) rings before disconnecting an unanswered call; and

(b) Within two (2) seconds after the completed greeting of the person called, a prerecorded message is played that promptly provides the disclosures required by 16 C.F.R. 310.4(d) or (e), followed immediately by a disclosure of one or both of the following:

(1) In the case of a call that could be answered in person by a consumer, that the person called can use ml automated interactive voice; m1d/or keypress-activated opt-out mechanism to assert a Do Not Call request pursuant to 16 C.F.R. 310.4(b)( 1)(iii)(A), at any time during the message. The mechanism must (a) automatically add the number called to the Company's entity-specific Do Not Call list, (b) once invoked, immediately disconnect the call, and (c) be available for use at any time during the message;

(2) In the case of a call that could be answered by an answering machine or voicemail service, that the person called can use a toll-free telephone number to assert a Do Not Call request pursuant to 16 C.F.R. 310.4(b)(l)(iii)(A). The number provided must connect directly to an automated interactive voice or keypress-activated opt-out mechanism that automatically adds the number called to the caller's entity-specific Do Not Call list (b) immediately thereafter disconnects the call; and (c) is accessible at any time throughout the duration of the telemarketing campaign; and complies with all other requirements of this part and other applicable federal and state laws.

(a) Paragraph (a) above shall not apply to any outbound telephone call that delivers a prerecorded healthcare message made by, or on behalf of, a covered entity or its business associate, as those terms are defined in the HIPAA Privacy Rule, 45 CFR 160.103.

(b) In addition, the Seller must comply with any state law applicable to prerecorded messages.

(c) The Seller shall adopt and comply with compliance policies which comply in all respects with applicable law, and shall cause all suppliers, vendors and subcontractors of Seller to adopt and comply with compliance policies which comply in all respects with applicable law. The Company shall have the right to inspect such compliance policies and verify such compliance by the Seller.

6.5    Call Abandonment Ssfe Harbor. The Call Abandonment Safe Harbor, subsection 310.4(b)(4)(iii) of the TSR, provides that any caller will not be liable for violating 16 C.F.R. 310.4(b)(1)(iv); provided, that (i) the caller employs technology that ensures abandonment of no more than three (3) percent of all calls answered by a person, measured over the duration of a single calling campaign, if less than 30 days, or separately over each successive 30-day period or portion thereof that the campaign continues, (ii) the caller, for each telemarketing call placed, allows the telephone to ring for at least fifteen (15) seconds or four (4) rings before disconnecting an unanswered call, (iii) whenever a sales representative is not available to speak with the person answering the call within two (2) seconds after the person's completed greeting, the caller promptly plays a recorded message that states the name and telephone number of the entity on whose behalf the call was placed. This provision does not affect any of the Seller's obligations to comply with relevant state and federal laws, including but not limited to the TCPA, 47 U.S.C. 227, and 47 CFR part 64.1200.

6.6    Compliance with State and Local Laws. Each party shall comply with any applicable state telemarketing, telephone solicitation or consumer protection laws as well as with any applicable state registration and licensing requirements in any state in which it transacts business and/or renders services pursuant to this Agreement, as same may be amended from time to time.

6.7    Compliance with Federal Laws. Each party shall comply with any applicable Federal statutes, rules and regulations while rendering services pursuant to this Agreement, including, but not limited to:

(a)    The Federal Trade Commission Act, 15 U.S.C. §§ 45(a), 53(b) and 57b;

(b)    The Telemarketing and Consumer Fraud and Abuse Act, 15 U.S.C. §6101;

(c)    The Telemarketing Sales Rule, 16 C.F.R 310;

(d)    The Telephone Consumer Protection Act, 47 U.S.C. § 227, and 47 C.P.R. part 64.1200;

(e)    If a party engages in an electronic marketing campaign, the Controlling The Assault of Non-solicited Pornography and Marketing Act of 2003 (the "CAN-SPAM Act");

(f)    The provisions of Title 18, section 1037 of the United States Code relating to criminal fraud and related activity in connection with electronic mail;

(g)    The Children's Online Privacy Protection Act ("COPPA"), Title 15, §§ 6501-6506 of the United States Code;

(h)     The Computer Fraud and Abuse Act ("CFAA"), Title 18, section 1030 of the United States Code;

(i)     The federal laws protecting intellectual property (Copyrights are protected by Title 17 of the United States Code, which provides civil remedies for infringement, and Title 18 of the United States Code, which imposes criminal penalties for copyright infringement. Patents and Trademarks are protected by Titles 35 and 15, respectively, of the United States Code, which provide civil remedies for infringement.);

(j)     The Electronic Communications Privacy Act (Title 18, sections 2510, 2511 and 2701 of the United States Code, which prohibits the interception, use and disclosure of wire, oral or electronic communications and provide civil remedies and criminal penalties for violations.);

(k)     The Electronic Signatures in Global and National Commerce Act (the "E- Sign Act"), which seeks to promote the use of electronic signatures in interstate and foreign commerce by declaring that a signature, contract or other record relating to such transaction may not be denied legal effect, validity or enforceability solely because it is in electronic form or an electronic signature or record was used in its formation. The Act also requires certain consumer disclosures and the retention of business records;

(l)     The Fair Labor Standards Act of 1938 (Title 29, sections 201-219 of the United States Code) establishes minimum wages and maximum hours for employees and provides remedies and protections to aggrieved employees. Title 29, sections 541.300 and 541.400 of the Code of Federal Regulations define the exemptions from the minimum wage and maximum hour requirements for executive, administrative, professional, computer and outside sales employees;

(m)     The Fair Housing Act (42 U.S.C. § 3601 et seq.), which prohibits certain forms of discrimination on the basis of race, color, religion, sex, familial status, or national origin;

(n)     The Restore Online Shoppers' Confidence Act (15 U.S.C. §§ 8401-8405), which Prohibits "any post-transaction third party seller" from charging or attempting to charge "any consumer's credit card, debit card, bank account or other financial account for any good or service sold in a transaction effected on the Internet, unless" the third party seller, before getting the consumer's billing information, "clearly and conspicuously" discloses to the consumer "all material terms of the transaction" and gets the consumer's "express informed consent for the charge." "All material terms of the transaction" must include, in addition to basics already required by existing law like "a description of the goods or services being offered" and "the cost of such goods or services," that the "third party seller is not affiliated with the initial merchant" by disclosing the third party seller's name "in a manner that clearly differentiates the post-transaction third party seller from the initial merchant." In order to obtain "express informed consent," the third party seller must get from the consumer "the full account number of the account to be charged," "the consumer's name and address and a means to contact the consumer,"

and require the consumer "to perform an additional affirmative action, such as clicking on a confirmation button or checking a box that indicates the consumer's consent to be charged the amount disclosed." In addition to imposing new disclosure requirements on post-transaction third party sellers, the Act prohibits the initial merchant from disclosing "a credit card, debit card, bank account, or other financial account number, or to disclose other billing information that is used to charge a customer of the initial merchant, to any post transaction third party seller for use in an Internet- based sale of any goods or services from that post-transaction third party seller." Finally, the Act prohibits "any person" from charging or attempting to charge "any consumer for any goods or services sold in a transaction effected on the Internet through a negative option feature" as defined by the Telemarketing Sales Rule unless the person "clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information obtains a consumer's express informed consent before charging the consumer's [account] and provides simple mechanisms for a consumer to stop recurring charges from being placed on the consumer's [account]." The Act does not apply unless the company is a (1) a "post-transaction third party seller," (2) discloses billing information to any post transaction third party seller for use in an Internet-based sale of any goods or services from that post-transaction third party seller, or (3) sells goods or services using a negative option feature.

7.    <u>ACCOUNTING RECORDS</u>.  Each party shall maintain true and complete books and records in accordance with generally accepted accounting principles reasonably necessary to determine the amounts payable hereunder.

8.    <u>REPRESENTATIONS AND WARRANTIES OF SELLER</u>. Seller represents and warrants to the Company that:

(a)    it is a corporation duly formed validly existing and in good standing under the laws of the state of its incorporation, and has all necessary corporate power and authority to carry on its business as now being conducted, and possess all licenses, franchises, approvals, rights and privileges material to the conduct of its business;

(b)    it has the corporate power to enter into this Agreement;

(c)    the execution, delivery and performance of this Agreement by the Seller has been duly authorized and, when executed and delivered, shall constitute the valid and binding obligation of the Seller enforceable in accordance with its terms; and

(d)    the execution, delivery and performance by the Seller of its obligations under this Agreement will not constitute a violation of, conflict with, result in any breach of or constitute a default under any other instrument to which the Seller is a party to or by which the Seller is bound.

expense of the Indemnifying Party, to defend against such claim; provided further, that, the Indemnified Party is hereby authorized (but not obligated) prior to and during the Notice Period to file any motion, answer or other pleading and to take any other action that the Indemnified Party shall deem necessary or appropriate to protect the Indemnified Party's interests. In the event that the Indemnifying Party notifies the Indemnified Party within the Notice Period that the Indemnifying Party does not dispute the Indemnifying Party's obligation to indemnify hereunder and desires to defend against such claim, except as hereinafter provided, the Indemnifying Party shall have the right to defend by appropriate proceedings, which proceedings shall be promptly settled or prosecuted by the Indemnifying Party to a final conclusion; provided, further, that, unless the Indemnified Party otherwise agrees in writing, the Indemnifying Party may not settle any matter (in whole or in part) unless such settlement includes a complete and unconditional release of the Indemnified Party and provides solely for monetary damages. If the Indemnified Party desires to participate in, but not control, any such defense or settlement the Indemnified Party may do so at its sole cost and expense. If the Indemnifying Party (a) fails to timely notify the Indemnified Party it will not defend or (b) actually fails to defend the Indemnified Party against such Claim, whether by not giving the Indemnified Party timely notice as provided above or otherwise, then, without waiving any rights or conflict of interest Claims against the Indemnifying Party, the Indemnified Party may settle or defend against any such claim or demand in the Indemnified Party's sole discretion at the cost of the Indemnifying Party and, if it is ultimately determined that the Indemnifying Party is responsible therefore under this Section, then the Indemnified Party shall be entitled to recover from the Indemnifying Party the amount of any settlement or judgment and all indemnifiable costs and expenses of the Indemnified Party with respect thereto, including, without limitation, interest from the date such costs and expenses were incurred.

(c)     This section shall survive the expiration or termination of this Agreement.

(d)     In the event that the Company has a claim for indemnification against the Seller under Section 10(a), the Company shall have the right to offset any amounts which it may owe to the Seller with any funds which the Company may possess on behalf of or owe to the Seller.


11.     TRADE SECRETS AND CONFIDENTIALITY.

11.1     Trade Secrets and Confidential Information. The Seller recognizes that the Company's trade secrets and confidential information were developed through considerable investment of time, effort and money, are proprietary, and their disclosure would be harmful and damaging to its business.

"Trade Secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process that: (a) derives independent economic value, actual or

9.  **REPRESENTATIONS AND WARRANTIES OF THE COMPANY.** The Company represents and covenants to the Seller that:

(a)  it is a corporation duly formed, validly existing and in good standing under the laws of the state of its incorporation, and has all necessary corporate power and authority to carry on its business as now being conducted, and possess all licenses, franchises, approvals, rights and privileges material to the conduct of its business;

(b)  it has the corporate power to enter into this Agreement;

(c)  the execution, delivery and performance of this Agreement by the Company has been duly authorized and, when executed and delivered, shall constitute the valid and binding obligation of the Company enforceable in accordance with its terms; and

(d)  the execution, delivery and performance by the Company of its obligations under this Agreement will not constitute a violation of, conflict with, result in any breach of or constitute a default under any other instrument to which the Company is a party to or by which the Company is bound.

10. **INDEMNIFICATION.**

(a)  The parties shall indemnify, defend and hold each other and their directors, officers, shareholders, employees, agents, lenders and investors harmless from and against any and all actual or threatened claims, losses, proceedings, actions, liabilities, judgments, awards or costs, including reasonable attorney's fees and expenses and costs of investigations (collectively, "Losses") arising out of or related to: (a) the breach of any representations or warranties contained in this Agreement; (b) the failure to perform any obligations hereunder; or (c) the failure to comply with applicable law arising out of this Agreement or any investigation or allegation thereof.

(b)  In the event that any claim is made or asserted against a party entitled to indemnification under this Agreement (the "Indemnified Party"), the Indemnified Party shall with reasonable promptness notify the other party with an indemnification obligation (the "Indemnifying Party") of such claim (the "Claim Notice"), specifying the nature of such claim and the amount or the estimated amount thereof to the extent then feasible (which estimate shall not be conclusive of the final amount of such claim); provided that, any failure to provide such notice shall not relieve the Indemnifying Party of any obligation hereunder, except to the extent that such Indemnifying Party is irrevocably prejudiced thereby. The Indemnifying Party shall have fifteen (15) days from the receipt of the Claim Notice (the "Notice Period") to notify the Indemnified Party (i) whether or not the Indemnifying Party disputes liability to the Indemnified Party hereunder with respect to such claim and (ii) if the Indemnifying Party does not dispute such liability, whether or not the Indemnifying Party desires, at the sole cost and

potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

"Confidential Information" means information that would cause an unfair advantage to competitors by providing them information as to the commercial operations of the Company and includes, but is not limited to business lists; records and information of prospective and actual customer names and other personal information of consumers, including contacts, addresses, and lists, contracts, transactions, plans, designs, policies, reports, histories, information reports and information; customer leads and methods of generating customer leads; scripts, sales techniques, policies, methods and procedures for sales; pricing and marketing; prices and price lists; inventory and inventory lists; vendors' names and contact information, supplies, suppliers' names and addresses, and supplier and supply lists; manufacturer, distributor and supplier company names, contacts, addresses, lists, transactions, contracts, policies, reports, histories, products, rate books, comparisons, and information; advertising, advertising copy and programs; endorsers' names and addresses; sales reports, business reports, financial statements and reports, and operating statements; employees, agents, subagents, and independent contractor names, addresses, lists, commissions, productivity and information; computer programs, computer software, databases, and data; and know-how, discoveries, inventions, writings, conceptions, knowledge, information, plans, programs, and ideas and tangible expressions of ideas.

"Customer" or "Consumer" means anyone whose name appears on a database, lead list, customer list, or report of the Company; anyone to whom the Company has sold, rendered or exchanged any Products; anyone who has ordered any Products from the Company; and anyone solicited by the Company for the sale of any Products pursuant to this Agreement.

These lists are not exclusive; there may now and in the future be other types of information that constitute trade secrets and confidential information and which are included within the scope of this Agreement.

    11.3   Return of Tangible Information. The Seller agrees that all books, papers, records, lists, files, forms, reports, accounts, documents, supplies, equipment, photographs, cassettes, compact disks, videotapes, databases, disks, data, computers, peripherals, hardware, programs, software, floppy disks, hard drives, magnetic media, storage media, CD-ROMs, accessories, parts, components, manuals, documentation, research papers and information relating in any manner to the Company or its business, operations, prices, vendors, suppliers or customers, whether prepared by the parties hereto or anyone else, and whether or not containing a trade secret or confidential information, that were disclosed or turned over to the Seller, or turned over by the Seller to the Company with respect to Contracts purchased by the Company, pursuant to this Agreement are the exclusive property of the Company and that any such tangible documents

or information, whether electronic or hard copy shall immediately be returned to the Company within 10 days after termination of this Agreement or earlier at the Company's request at any time.

11.4   <u>Confidentiality by the Seller</u>.   The Seller agrees to keep secret and treat confidentially all of the Company's trade secrets and confidential information (whether or not copyrightable or patentable).   Specifically, the Seller agrees not to do any of the following, directly or indirectly: use, publish, disclose or communicate any of the Company's Trade Secrets or Confidential Information to anyone; print, copy, publish, display, reproduce or allow anyone else to print, copy, publish, display or reproduce any information in tangible form containing a trade secret or Confidential Information; aid others in learning of or using or planning the use of any of the Company's  Trade Secrets or Confidential  Information; use the Company's Trade Secrets or Confidential Information for its own account or benefit; or aid, assist or plan for other persons to use the Company's Trade Secrets or Confidential Information for their own account or benefit. This obligation of confidentiality shall exist while the parties are engaged in discussions or negotiations to determine whether to enter into a business relationship and shall continue after the date of termination of such discussions or negotiations for the longer of ten (10) years or the date that all elements of the Trade Secrets and Confidential Information are public knowledge and no longer proprietary to the Company.  This obligation of confidentiality  shall not be released  in case of the public availability of a part of the Company's Trade Secrets or Confidential Information, it being acknowledged that individual elements of the Company's Trade Secrets or Confidential Information may through no fault of its own become publicly available, but the availability of individual elements of Trade Secrets or Confidential Information does not result in appreciation of the use or value of those elements nor does it make publicly known the integrated package  of information  and know-how having value to the Company's business as useful information.

12.   <u>REMEDIES</u>.   The Seller agrees that each of the above matters is important, material, confidential, and gravely affects the effective and successful conduct of the business of the Company and affects its value, reputation and goodwill. If the Seller breaches any provision of this Agreement, the Company shall be entitled to obtain temporary and permanent injunctions, specific performance, damages (to the extent, if at all, that they are ascertainable; including but not limited to compensatory, incidental, consequential, punitive, exemplary, and lost-profits damages), costs and reasonable attorneys' fees at all levels, including but not limited to appeals without any requirement to post a bond, security or other undertaking. The Seller agrees that if it breaches any provision of this Agreement it shall be conclusively presumed that irreparable injury would result to the Company and there would be no adequate remedy at law. This Agreement does not limit the rights and remedies that the Company otherwise has by law, equity or statute.

13.   NOTICES.   All notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and will be deemed to have been given (i) when delivered if personally delivered by hand (with written confirmation of receipt), (ii) when received if sent by a nationally recognized overnight courier service (receipt requested), (iii) shall be mailed by registered or certified mail, postage prepaid, after five (5) days, or (iv) if sent via facsimile, upon confirmation of facsimile transmission, if sent during normal business hours of the recipient, or if not sent during normal business hours of the recipient, then on the recipient's next business day, or (v) if sent via electronic mail, upon its delivery, if sent during normal business hours of the recipient, or if not sent during normal business hours of the recipient, then on the recipient's next business day. Notices, demands and communications to the Company and Seller will, unless another address is specified in writing, be sent to the address indicated below:

If to the company:
Lifewatch, Inc.
266 Merrick Road
Suite 104
Lynbrook, New York 11563
Attention:  Evan Sirlin
Facsimile:  (516) 599-3620
Email: evan@lifewatch-usa.com

With a copy (which shall not serve as notice) to:
Abrams, Fensterman, Fensterman, Eisman, Formato, Ferrara &Einiger, LLP
1111 Marcus Avenue - Suite 107 Lake Success, New York 11042
Attention: Neil Kaufman
Fax No.: (516) 328-6638
Email: nkaufman@abramslaw.com

If to the Seller:



14.    ADDITIONAL PROVISIONS.

    14.1    Governing Law. This agreement shall be governed, interpreted, construed and enforced in accordance with the laws of the State of New York without regard to the conflict of laws principles thereof. The parties thereto do hereby consent and submit to the venue and jurisdiction of the state and federal courts sitting in the State of New York, County of Nassau, as the sole and exclusive forum for the enforcement of this Agreement, and further agree that, in the event of any action or suit as to any matters of dispute between the parties, service of any process may be made upon the other party in the same matter as the giving of notices under paragraph 13 of this Agreement.

    14.2    Attorney's Fees and Costs. In any litigation arising out of this Agreement, the prevailing party shall be entitled to recover all reasonable attorneys' fees and expenses and costs of litigation, at the trial and appellate levels.

    14.3    Merger Clause. This Agreement and any attached Addenda constitute(s) the entire understanding between the parties with respect to the subject matter hereof and all prior or collateral negotiations, understandings or agreements are merged herein.

    14.4    Modification. This Agreement may be amended or modified only by a written instrument signed by each of the parties hereto.

    14.5    Severability. In the event any provision of this agreement is determined by a court of competent jurisdiction to be invalid, illegal or unenforceable, such provision shall be fully severable and this agreement shall be construed and enforced as if such illegal, invalid, or unenforceable provision never comprised a part of this Agreement. Furthermore, in lieu of such illegal, invalid, or unenforceable provision, there shall be added automatically as part of this agreement, a provision as similar in its terms to such illegal, invalid or unenforceable provision as may be possible (while maintaining the economic intent of the parties under this Agreement) and be legal, valid, and enforceable.

    14.6    Assignment. Except as otherwise provided herein, Seller may not assign this Agreement or any of its rights or obligations under this Agreement without the prior written consent of the other party. Any attempted or purported assignment in violation of this provision shall be null and void.

    14.7    Waiver. The failure of either party to this Agreement to object to or to take affirmative action with respect to any conduct of the other which is in violation of the terms of this agreement, shall not be construed as a waiver of that conduct or any future breach or subsequent wrongful conduct.

14.8    Headings.  The headings in this Agreement are inserted for convenience only and shall not affect the interpretation or construction of this agreement or any portion thereof.

14.9    Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, all of which together shall constitute one and the same instrument.

14.10    Parties Bound.  This Agreement shall be binding upon the parties, their successors in interest and assigns.

14.11    Restatement and Replacement of the Marketing Agreement.  This Purchase Agreement is intended to replace and restate the Marketing Agreement in its entirety as of June 1, 2012.

14.12    SIGNATURE PAGE TO FOLLOW

WHEREFORE, the parties have executed this Agreement as of date set forth above.

**The Company:**

**LifeWatch Inc.**

By: _____

**The Seller:**

# ATTACHMENT 2

1. I, ███████ serve as the Managing Member/CEO for ██████████

2. I have personal knowledge of the facts set forth herein, which are known to me to be true and correct.

3. ██████████████████ entered into a Purchase Agreement with Lifewatch, Inc. on or about ██████████

4. Pursuant to the Purchase Agreement, ██████████████ uses a variety of methods, including but not limited to telemarketing, to obtain customer accounts. Thereafter, ████████████████ sells those customer accounts to Lifewatch on a non-exclusive basis.

5. Lifewatch does not prohibit us from doing business with other companies, and, we have done business with other companies.

6. Pursuant to the Purchase Agreement, ████████████████ warrants and covenants to Lifewatch that ██████████████ strictly complies with all state and federal laws, including telemarketing laws.

7. ████████████████ received the following types of documents from Lifewatch: a) a technical overview of phone service providers and a description of which phone service providers are compatible with Lifewatch's personal emergency response services and products; b) pricing options relative to Lifewatch's personal emergency response services and products; c) general facts and information about Lifewatch's personal emergency response services and products; d) an ACH and Credit Card authorization script.

8. Lifewatch never directly or indirectly provided sales scripts to ██████████████

9. Lifewatch does not review, approve, dictate, draft, authorize or control sales scripts used by ██████████████

10. Lifewatch does not and cannot control, oversee, or supervise ██████████████ relative to its efforts to obtain customer accounts or its day to day activities.

11. Lifewatch does, however, require that we:

    a. properly recite the ACH or Credit Card Processing script;

b.  make no misrepresentations about, among other things, the products, services, or payments;

c.  do not indicate that Lifewatch's products are "free";

d.  do not indicate that Lifewatch's products were purchased for the prospective customer by a friend or family member;

e.  do not utter phrases trademarked by other companies; and

f.  do not indicate that Lifewatch's products are or were endorsed by any public or private entities.

12. On a weekly basis, Lifewatch employee Lauren Vandewater requests recordings of customer telephone conversations. We understand that she does so — as part of Lifewatch's quality control program - to ensure that ███████████████ is compliant with Lifewatch's requirements.

13. We understand that if ███████████ fails to comply with Lifewatch's quality control requirements, Lifewatch will terminate the Purchase Agreement with █████████

14. We also understand that if ████████████ practices are non-compliant with state or federal law, Lifewatch will terminate the Purchase Agreement with █████████

15. ████████████ complies with Lifewatch's requirements.

16. ████████████ does not use an auto-dialer or engage in "robo-calling" or "call spoofing," all of which we understand to be violative of various state and federal laws.

17. ████████████ does not withhold caller identification.

18. ████████████ provides prospective customers with seller identification, information about the purpose of the calls, and information as to the nature of the goods and services being sold.

19. ████████████ does not call telephone consumers who have registered their telephone numbers on the "do not call registry."

20. ████████████ complies with all state and federal laws.

I declare under penalty of perjury that the foregoing is true and accurate to the best of my knowledge.

Dated:

